(25 Misc. Rep. 745.)

SCHILLINGER v. McGARRY.

(Supreme Court, Appellate Term. January 23, 1899.)

1. BUILDING CONTRACTS—CONSTRUCTION.
    A contract to "furnish all the cement and necessary material, cellars, vaults, areas, and sidewalks, and all coal-cinder filling, and also the asphalt work, viz. the laying of asphalt on first floors, and in water-closets, halls, and wardrobes," does not include coal-cinder filling above the first story.

2. SAME—REFUSAL TO PERMIT PERFORMANCE—EVIDENCE.
    Plaintiff testified that on two occasions in March defendant refused to let him complete the work contracted for, while defendant testified that his last conversation with plaintiff was in February, at which time plaintiff refused to complete the work. A witness present at the conversation in February testified that plaintiff refused to do certain work not provided for in the contract. Held, that plaintiff was entitled to go to the jury on the question whether defendant had refused to allow him to complete the work.

Appeal from municipal court, borough of Manhattan, Seventh district.

Action by George Schillinger against William P. McGarry. A verdict was directed for defendant, and from a judgment entered thereon plaintiff appeals. Reversed.

Argued before BEEKMAN, P. J., and GILDERSLEEVE and GIEGERICH, JJ.

David Gordon, for appellant.
Henry W. Eaton, for respondent.

GIEGERICH, J. This action was brought to recover damages claimed to have been sustained in consequence of the defendant's refusal to allow the plaintiff's assignors to complete and carry out their part of an agreement in writing, bearing date the 1st day of October, 1897, made under their firm name of George Schillinger & Co., of which firm the plaintiff was a member, on the one part, and

55 N.Y.S.—43

the defendant, on the other, by the terms of which they agreed to "well and sufficiently finish all the cement and concrete work, and furnish all the cement and necessary material, cellars, vaults, areas, and sidewalks, and all coal-cinder filling, and also the asphalt work, viz. the laying of asphalt on first floors, and in water-closets, halls, and wardrobes, at the new annex to Grammar School No. 2, situate at No. 116 Henry street, in the city of New York, and that all work mentioned herein shall be done by the said parties of the second part, according to the plans and specifications of ———, architect, for the sum of $2,290."

The principal questions contested upon the trial were whether the plaintiff's assignors were required to lay the coal-cinder filling above the first story, and whether the defendant had prevented the former from performing the conditions of the contract on their part. With respect to the first-stated proposition, the trial justice, in denying the motion to dismiss the complaint made when the plaintiff rested, held that the plaintiff's assignors were not obliged to do any coal-cinder filling above said last-mentioned part of the building; and, to my mind, such construction is fairly warranted by the contract.

The testimony regarding the other question was conflicting. The plaintiff testified that his assignors began work under the contract on October 23, 1897, and worked at intervals until March 3, 1898; that in response to defendant's letter of March 1, 1898, requiring said firm to perform the conditions of the contract on their part, the witness had an interview on March 2, 1898, with the defendant, in the course of which the latter insisted that by the terms of the contract the said firm was required to lay the coal-cinder filling on all the floors of the building. This was disputed by the plaintiff, who maintained that said filling was only to be laid in the cellar, sidewalks, yards, and water-closets, whereupon the defendant offered to pay $3,600, if the firm would stipulate to do the work in dispute in addition to that called for by the contract. The plaintiff promised to consult his partners that evening, or on the following morning, and advise the defendant through the telephone of the result of the consultation. The next morning he telephoned the defendant that his firm was willing to do the work for $3,800, which offer was rejected; the defendant saying he would do the work himself. The plaintiff further testified:

"I was ready every time to finish, only Mr. McGarry was not ready so I could finish, because he didn't have the filling the right height, and in one place he didn't have the coping there. Q. Did you ever have any conversation with Mr. McGarry, after the one in which he said he would do the work himself? A. About fourteen days afterwards I went there again, and saw him in Madison street, and I asked him if he was ready for me to start in. He said: 'I am not ready for you at all. You broke the contract, and ain't got any right to do something more.' I asked him about money, and he said: 'You will have to wait for your money until I finish, and, if it costs more, I will charge you for that.' I said: 'You ain't a right to do my contract work. We did the work last October, and ain't got a cent. I must pay my men.' He said: 'Go to court, or somewhere else, where you will get it.' "

On cross-examination the witness testified that on March 3, 1898, his firm had three men upon the job doing "patching work," and

carting the coal cinders from the "street side" to the "Madison street side." Upon being interrogated by the court, he testified:

"Q. When did you stop work? A. I didn't stop. I couldn't go further. He was not ready. Q. If you couldn't go further, you stopped. A. I was there— I couldn't go further, as he was not ready for me. The cellar on Madison street side,—that was brick and marble mixed, and I couldn't get in; and the coping was not set in the yard. Q. How long did that continue? A. I was there a couple of days afterwards, and he was not ready. I spoke to him, and he said I broke the contract, and wouldn't let me do anything more, and said he would do it himself. Q. When was that? A. That was about March 6th or 7th."

The defendant, in his own behalf, testified that the plaintiff's assignors did not, as testified, do any work under the contract in the month of March, but that, on the contrary, the last work performed by them was in the latter part of February, when, according to the witness, there was "plenty of work ready for him to do"; that the plaintiff's firm did not render any services after the defendant wrote the letter of March 1st, nor did he at any time prevent it from going on with the work; that in the latter part of February the defendant asked the plaintiff to proceed and do all the concreting cinder work, and that one Gibbs was present at "one conversation," which, in detail, is as follows:

"Q. State the conversation with Mr. Schillinger and Mr. Gibbs. A. I saw Mr. Schillinger nearly every morning, and I met him at the school with Mr. Gibbs, and we went into the office and talked the matter over. The inspector was there, and I said the specifications call for it, and I said, 'Go ahead.' and he said, 'I can't afford to do it; it costs so much money.' I wanted the work done, and said, 'How much will it cost?' He said $1,400 or $1,500. We talked about $1,000, and I said to Gibbs, 'Will you pay one-half and I will pay one-half?' and he said, 'I won't pay five cents.' And I said I couldn't afford to pay it. He said, 'I will see my partner to-night, and let you know.' I didn't hear anything from him. Mr. Gibbs told me to go ahead. Q. Did you have any other conversation with Mr. Schillinger? A. No, sir."

The defendant further testified that in March, 1898, he started to complete the work, that it was subsequently completed, and that the work was done by third parties. On cross-examination the defendant further testified:

"Q. Do you remember a conversation with him on the telephone, where he told you how much it would cost to do the entire concrete work and the arches? A. Not on the telephone. The only conversation I had was in Mr. Gibbs' presence, and I wanted him to complete his work, as I had a great deal of money standing, and Mr. Gibbs told me if I didn't do it he would get somebody else to do it. Q. When Schillinger told you he could not do the arch work and all the cinder concrete work in the other building, what did you say? Did you tell him to go ahead? I said, 'Your contract calls for it; go ahead and finish.' There was talk about the asphalt then. He was to complete the work any way,—the whole of it."

The said David S. Gibbs was called as a witness by the defendant, and testified that he was the contractor of the building in question, and that the defendant was the subcontractor under him; that the plaintiff's assignors did not do any work upon the building after the month of February, except on the 1st day of March, when some cement was taken away; that he was present at a conversation between the defendant and the plaintiff, which the witness detailed as follows:

"Q. Tell us what was said at that time in reference to completing the work.
A. Mr. McGarry wanted him to go on and complete the work, and I tried
to persuade him to go on and complete it, and it seems Mr. Schillinger said
he didn't figure to do some part of the work; and I advised Mr. McGarry and
Schillinger to fix the matter up and go on with the work, because we were
anxious to get it through. Mr. Schillinger, I believe, said that he would see
his partner in a day or two, or that night, and the next day would report what
they would do. Mr. McGarry claimed he was to do all the concrete work and
asphalting on the job."

After the plaintiff had testified in rebuttal that three of his firm's
men had worked upon the job on March 3d, the testimony was closed,
and the defendant moved for a direction of a verdict in his favor.
The plaintiff, on the other hand, asked to go to the jury upon the
question of fact involved in the case. The court below, in grant-
ing the former's application, said:

"The burden of proof is cast upon the plaintiff in this case. He testified
that the defendant, McGarry, would not permit him to do the work. Mr.
McGarry meets that by testifying he refused to do the work, and he proves
here a demand that he proceed with the work. In addition to that, the de-
fendant proves, by the evidence of a person who is not interested in the con-
troversy, and who testified, that, at the time when a certain conversation took
place, there was work there ready to be done, and that the plaintiff would not
and did not proceed. Under these circumstances, I must hold whatever breach
of contract there was, so far as the evidence shows, was a breach brought
about by the action of the plaintiff, which precludes him from recovering in
this action. You will find, in accordance with that direction, for the defend-
ant."

The plaintiff noted an exception, and this brings up for determi-
nation the crucial question, whether such direction was justified.
Justification of such a course is only warranted when the facts are
undisputed, or so certain and convincing that no reasonable min'
could come to any but one conclusion. Esmond v. Seeley, 28 App.
Div. 296, 300, 51 N. Y. Supp. 36, citing Bagley v. Bowe, 105 N. Y.
171, 11 N. E. 386; Linkauf v. Lombard, 137 N. Y. 417, 33 N. E. 472;
Hemmens v. Nelson, 138 N. Y. 517, 34 N. E. 342. See Luhrs v. Rail-
road Co., 13 App. Div. 126, 42 N. Y. Supp. 1101; Illston v. Evans, 27
App. Div. 447, 50 N. Y. Supp. 82.

As was said in Bagley v. Bowe, 105 N. Y. 179, 11 N. E. 389:

"If there is ground for opposite inferences, and a conclusion either way
would not shock the sense of a reasonable man, then the case is for the jury,
although the judge may entertain a clear and decided conviction that the truth
is on this or that side of the controversy."

Applying these principles to the present case, it is clear that the
court below was not authorized to direct a verdict, but should have
submitted the case to the jury. The testimony offered in the de-
fendant's behalf was not, in my opinion, "so certain and convincing
that no reasonable mind could come to any but one conclusion."
On the contrary, interpreting the evidence in the most favorable
light to the plaintiff, to which interpretation he is entitled by rea-
son of the aforesaid disposition of the case, there is, to my mind,
ample ground for "opposite inferences." The testimony of the plain-
tiff tended to show that upon at least two occasions in March, 1898,
the defendant refused to permit him to proceed with the work. Yet
the latter denied having had any interview with him during that

month, and claimed to have had one in the latter part of February, the substance of which has been stated.   Great stress has been laid by the defendant upon the testimony of Gibbs, but, as seen, the same related only to the conversation claimed to have been had at the time last mentioned; and hence the defendant's testimony, except in this particular instance, was not corroborated.   The mere fact that the alleged refusal of the defendant to allow the plaintiff's assignors to perform during the month of March depended entirely upon plaintiff's testimony, and which was contradicted by the defendant, did not authorize a direction in favor of the latter.   "The testimony is not necessarily balanced," observed Rumsey, J., who wrote in Felbel v. Kahn, 29 App. Div. 270, 272, 51 N. Y. Supp. 436, "because one witness swears one way and one another, but ordinarily, unless there is some great discrepancy between the testimony and established facts, which necessarily shows that one or the other witness is mistaken, or is not telling the truth, the question must be determined precisely as though there were more than one witness on each side." Apart from this, the alleged conversation related entirely to but one out of possibly a number of conversations, which may have been had between the parties upon the subject; and as the one testified to related largely, if not entirely, to the coal-cinder filling, the same can have no great force, in view of the fact that the plaintiff's assignors were not, by the terms of the contract, obliged to do any above the first story.   Moreover, it appears from Gibbs' testimony that he advised the plaintiff to consult his partners regarding the matters in difference, and report at an early day; and thus, according to his testimony, there was not a refusal to proceed with the work, as the trial justice erroneously assumed.

It logically results from these views that the trial justice erred in directing the said verdict, and the judgment entered thereon must therefore be reversed, and a new trial ordered, with costs to the appellant to abide the event.   All concur.